UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HAROLD KLEIMAN, Individually and On Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>    vs.<br><br>RHI ENTERTAINMENT, INC., ROBERT A. HALMI, JR., and WILLIAM J. ALIBER,<br><br>                              Defendants. | Civil Action No. 1:09-cv-08634 (AKH) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

James E. Brandt
Jeff G. Hammel
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York  10022
(212) 906-1200

Attorneys for Defendants

May 3, 2010

**Table of Contents**

**Page**

Preliminary Statement ..........................................................................................................1

Background ..........................................................................................................................2

    A.    RHI ..............................................................................................................2

    B.    The Registration Statement ........................................................................3

        1. RHI's Business ......................................................................................3

        2. RHI's Cautionary Disclosures ...............................................................4

    C.    The Second Half of 2008 .............................................................................6

Argument ..............................................................................................................................6

I.    THE COMPLAINT FAILS TO STATE A SECTION 11 CLAIM ...................................6

    A.    Plaintiffs' Theory No. 1: RHI's Production Of 35, Not "Approximately 40," Movies Misled Investors .....................................................................7

    B.    Plaintiffs' Theory No. 2: RHI Failed To Disclose That Changing Technology Could Affect Demand For Its Movies ......................................9

    C.    Plaintiffs' Theory No. 3: RHI Failed to Disclose That It Obtained Only A Portion of Production Expense In Advance of Production ....................13

II.    THE COMPLAINT FAILS TO STATE A SECTION 15 CLAIM .................................14

Conclusion .........................................................................................................................15

## Table of Authorities

Page

### CASES

*Ashcroft v. Iqbal*,
  129 S.Ct. 1937 (2009) ............................................................................................................. 7

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)…………………………………………………………….....6, 7, 9

*Demaria v. Andersen,*
  318 F.3d 170 (2d Cir. 2003) ................................................................................................. 11

*Garber v. Legg Mason, Inc.*,
  537 F. Supp. 2d 597 (S.D.N.Y. 2008), *aff'd* 347 Fed. Appx. 665 (2d Cir. 2009) ................ 7, 14

*Garber v. Legg Mason, Inc.*,
  347 Fed. Appx. 664 (2d Cir. 2009) .................................................................................... 7, 10

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*,
  936 F.2d 759 (2d Cir. 1991) ............................................................................................... 9, 11

*In re Adams Golf, Inc. Sec. Litig.*,
  381 F.3d 267 (3d Cir. 2004) ................................................................................................. 13

*In re Arbinet-theexchange, Inc.*,
  No. 05-4404 (JLL), 2006 WL 3831396 (D.N.J. Dec. 28, 2006) ................................ 12, 13, 14

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  308 F. Supp. 2d 249, 255 (S.D.N.Y. 2004) .......................................................................... 7, 8

*In re JP Morgan Chase Sec. Litig.*,
  363 F. Supp. 2d 595 (S.D.N.Y. 2005) ..................................................................................... 7

*In re Keyspan Corp. Sec. Litig.*,
  383 F. Supp. 2d 358 (E.D.N.Y. 2003) .................................................................................. 12

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
  272 F. Supp. 2d 243 (S.D.N.Y. 2003) .................................................................................. 12

*In re Merill Lynch Auction Rate Sec. Litig.*,
  No. 09 MD 2030 (LAP), 2010 WL 1257597 (S.D.N.Y. Mar. 31, 2010) ................................ 9

*Klein v. Maverick Tube Corp.*,
  790 F. Supp. 68 (S.D.N.Y. 1991), *aff'd*, 969 F.2d 1041 (2d Cir. 1992) ................................. 11

*Landmen Partners Inc. v. Blackstone Group, L.P.*,
 659 F. Supp. 2d 532 (S.D.N.Y. 2009) ................................................................................ 10, 13

*Novak v. Kasaks*,
 216 F.3d 300 (2d Cir. 2000) ....................................................................................................... 1

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
 98 F.3d 2 (2d Cir. 1996) ........................................................................................................... 11

*P. Stolz Family P'ship L.P. v. Daum*,
 355 F.3d 92 (2d Cir. 2004) ....................................................................................................... 11

*Rombach v. Chang*,
 355 F.3d 164 (2d Cir. 2004) ..................................................................................................... 14

*Rubin v. MF Global, Ltd.*,
 634 F. Supp. 2d 459 (S.D.N.Y. 2009) ...................................................................................... 11

*Rubke v. Capital Bancorp, Ltd.*,
 551 F.3d 1156 (9th Cir. 2009) .................................................................................................... 9

*Scibelli v. Roth*,
 No. 98 Civ. 7228 (HB), 2000 WL 122193 (S.D.N.Y. Jan. 31, 2000) ......................................... 8

*Seibert v. Sperry Rand Corp.*,
 586 F.2d 949 (2d Cir. 1978) ..................................................................................................... 12

*Whirlpool Fin. Corp. v. GN Holdings*,
 67 F.3d 605 (7th Cir. 1995) ...................................................................................................... 13

*White v. Melton*,
 757 F. Supp. 267 (S.D.N.Y. 1991) ............................................................................................. 8

*Zirkin v. Quanta Capital Holdings Ltd.*,
 No. 07 Civ. 851 (RPP), 2009 WL 185940 (S.D.N.Y. Jan. 23, 2009) .................................. 7, 11

## STATUTES & RULES

15 U.S.C. § 77k(a) .............................................................................................................................. 6

Fed. R. Civ. P. 12(b)(6) ...................................................................................................................... 1

Defendants RHI Entertainment, Inc. ("RHI"), Robert A. Halmi, Jr., and William J. Aliber submit this memorandum of law in support of their motion to dismiss the Amended Complaint, dated March 18, 2010 ("Complaint," cited as "¶ _") pursuant to Rule 12(b)(6).

### Preliminary Statement

This case centers on the prediction in RHI's June 2008 registration statement that it anticipated producing "approximately 40" made-for-television movies and miniseries that year, while it ended up actually producing 35. On the theory that investors were misled about RHI's customer demand because the mid-year projection of "approximately 40" movies somehow did not include the possibility that 35 movies would be made by year-end—and ignoring all of RHI's cautionary and other disclosures—plaintiffs ask this Court to entertain a class action for violation of Sections 11 and 15 of the Securities Act of 1933. This is untenable.

Plaintiffs are well aware of the weakness of their claims. In fact, only one investor filed an initial complaint and only one even sought to be lead plaintiff. The first complaint alleged that RHI made 35 (not "approximately 40") movies because of the financial crisis that worsened in late 2008, which RHI supposedly should have foreseen and disclosed ahead of time. (Complaint, dated Oct. 9, 2009, ¶ 23.) Recognizing the futility of that theory— the securities laws do not require "clairvoy[ance]," *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000)—plaintiffs shift to new theories in the current Complaint. They now hypothesize that demand declined for television content generally because of new media technologies (like digital video recorders and mobile devices) and that this decline made it harder for RHI to self-finance a portion of its movie production costs—and that RHI failed to disclose these supposed "facts."

These new theories do not salvage a claim. The Complaint alleges nothing suggesting that RHI's projection of "approximately 40" movies was incorrect at the time of the

1

June 2008 registration statement, nor does it explain how a reasonable investor could possibly have been misled by a mid-year projection of "approximately 40" films when 35 films were actually made by year-end. Plaintiffs also do not explain how an investor could have been misled by the potential impact of technological advances when they allege no facts showing whether (or to what extent) those risks actually impacted RHI and, in any case, those risks were expressly disclosed in the registration statement. Plaintiffs also ignore the disclosures explaining how RHI financed the production costs of its films.

This case lacks any merit whatsoever. It should be dismissed, with prejudice.

## Background

**A.     RHI**

RHI was formed in January 2006 when Hallmark Entertainment LLC, a unit of Hallmark Cards Inc., became a private company and was renamed RHI. Mr. Halmi is its CEO and Mr. Aliber is its CFO. RHI is a leading producer of television content, mainly in the form of made-for-television ("MFT") movies and miniseries. From January 2000 to September 2007, RHI "developed and distributed 272 MFT movies and miniseries which . . . was more than [its] two nearest competitors combined." (Registration Statement, June 13, 2008, at 3, attached as Exhibit A to the Declaration of Jeff G. Hammel (cited as "Ex. _").) Its customers include networks such as ABC, CBS and NBC, as well as cable channels like the Hallmark Channel, Lifetime and the Sci-Fi Channel. (*Id.* at 2.) RHI's productions have won 104 Emmy Awards, 15 Golden Globe Awards and eight Peabody Awards. (*Id.* at 2.)

RHI became a public company through an initial public offering in June 2008. Plaintiffs challenge the registration statement for that offering in this lawsuit.

2

**B.      The Registration Statement**

**1.      RHI's Business**

RHI's registration statement set forth an extensive description of the company's business, and how it goes about creating MFT movies and miniseries. (*Id*. at 80-88.) That process involves, among other things, a development stage (*e.g.*, identifying a programming idea and writing a script), a project approval stage (or "greenlighting") and—relevant to this litigation—the production stage, which involves among other things the hiring of actors, directors and film crews. (*Id.* at 83-85.)

To finance production of a film, RHI seeks to "pre-sell" it to a broadcast or cable network for a "license fee equal to 30% to 60% of the production cost associated with a project, which a network pays to acquire the right to air [RHI's] content for a defined period of time" in a defined geographic area. (*Id*. at 84.) Generally, "[w]hen the initial license agreement is secured, the production process begins." (*Id.*) "It is [RHI's] practice not to commence production until [it has] a firm order for an initial license fee that typically equals 30% to 60% of [its] production costs." (*Id.* at 1; *see also id*. at 84.)

By definition, therefore, RHI generally self-finances a portion of its production costs (what plaintiffs call "deficit production costs" (¶ 29(d))). To cover those costs, and also to make a profit, RHI seeks additional licensors, such as other media outlets or networks outside the geographic area or time period of the initial licensor, as well as international customers and alternative distribution platforms. (Ex. A, at 84*.*) RHI's registration statement summarized this "proven production model" as follows:

> Our business model enables us to generate contractual sales for our new productions in advance of their delivery and provides visibility into long-term cash flows from the licensing rights of content in our film library. Key production model elements include:

3

- commencing production when we have a firm order for an initial license fee;

- collecting a significant portion of this contracted cash during production and the remaining contracted cash before the expiration of the initial licensing period; and

- contracting with additional customers to pre-sell rights which account for a majority of our production costs prior to delivery of our content.

(*Id.* at 3.)  RHI produced 43 movies and miniseries in 2007 (*id*. at 61) and predicted in its June 2008 registration that it "expect[s] to develop, produce and distribute approximately 40 MFT movies and miniseries" in 2008.  (*Id.* at 2.)

### 2. RHI's Cautionary Disclosures

The registration statement could not have been clearer about the risks associated with RHI's business and an investment in RHI.  The first page expressly stated:  "Investing in our stock involves a high degree of risk."  (*Id.* at cover page.)  It detailed the nature of those risks in a separate 16-page section entitled "Risk Factors", which investors were cautioned to "carefully consider."  (*Id.* at 16.)  This risk level stems in part from the "uncertainty [that] always exists with the production of television content whose success is subject to viewer tastes and preferences that can change in unpredictable ways."  (*Id.* at 17; *see also id.* at 16.)

RHI also disclosed many other risks that can affect its business.  For example, investors were expressly cautioned about the changes in technology that could affect RHI's business:

> *The advancement of video technologies may cause advertisers to shift their expenditures to media in which their commercial messages are not circumvented by technology, leading to a reduction in television advertising and a reduction in demand for our programming*.  The entertainment industry in general and the television industry in particular continue to undergo significant technological developments. Advances in technologies or alternative methods of product delivery or storage or certain

4

> changes in consumer behavior driven by these or other technologies and methods of delivery and storage could have a negative effect on our business. In particular, broadcast and cable networks place significant reliance on the revenue stream generated from commercial advertising. *Since the introduction of video technology such as Digital Video Recording, or DVR, television audiences now have the ability to circumvent commercials while they view television programming, which could negatively impact advertising demand for the advertisers for our content, and could therefore adversely affect our revenue. Similarly, further increases in the use of portable devices that allow users to view content of their own choosing while avoiding traditional commercial advertisements could adversely affect our revenue.* If we cannot successfully exploit these and other emerging technologies, it could have a material adverse effect on our business, results of operations and financial condition. This technology has impacted the Nielsen ratings, which advertisers utilize to determine the rates for advertising time which they purchase from the television networks**.** Lower Nielsen ratings may result in a decrease in the amount of advertising revenue received by the networks and the networks may not have sufficient cash flow to license our programming at current rates.

(*Id.* at 20 (emphasis added); *see also id.* ("DVR technology may cause advertisers to decrease their spending for broadcast and cable television advertising.").)

The registration statement also cautioned that RHI may not always adhere to its practice of obtaining license fees covering a portion of production costs prior to beginning production:

> We may not be able to sustain our production model of generating contractual sales and collecting a significant portion of our production costs in advance of the delivery of our content to an initial licensee. Historically, our production model has enabled us to contract for and collect license fees recouping the majority of our production costs for our MFT movies and mini-series before delivery of our content to an initial licensee. Although we intend to adhere to our practice of commencing production when we have contracted license fees for a significant portion of our production costs, we cannot assure you that this will always be the case. *We may begin production for a MFT or mini-series without an initial licensee's firm order, or we may rely on an alternative means of revenue to recoup our production costs . . .*

5

(*Id.* at 19 (emphasis added).)

These risk disclosures (notably not quoted in the Complaint) address precisely the issues plaintiffs contend were not disclosed in RHI's registration statement.

### C.  The Second Half of 2008

The second half of 2008 witnessed what former Federal Reserve Chairman Alan Greenspan (who did not predict it) described as a "once-in-a-century credit tsunami." (Testimony before the House Committee on Oversight and Government Reform, at 1 (Ex. B).) On August 7, 2008, RHI disclosed its second quarter earnings and advised investors that, rather than 40 MFT movies, it now "anticipate[d] delivery of 35 to 40 MFT movies." (¶ 32; RHI Press Release, dated August 7, 2008, at 3 (Ex. C).) Later, on November 6, 2008, as the market crisis worsened, RHI revised that prediction again, explaining that in light of "[c]urrent economic conditions," it anticipated making "between 30 and 35" movies, as well as cautioned that the turbulent financial markets could negatively impact RHI's use of credit facilities and its ability to access the financial markets to maintain liquidity. (¶ 32; RHI Quarterly Report Form 10-Q For the Quarterly Period Ended Sep. 30, 2008, filed Nov. 6, 2008, at 14, 21 (Ex. D).)

Ultimately, RHI produced 35 movies in 2008. (RHI 2008 Annual Report, Mar. 5, 2009, at 32 (Ex. E).) It is on that basis that plaintiffs attempt to bring this case.

### Argument

**I.    THE COMPLAINT FAILS TO STATE A SECTION 11 CLAIM**

Section 11 imposes liability, in certain circumstances, where a registration statement "contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Even before the Supreme Court recently required plaintiffs to plead facts that "raise[] a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

6

555 (2007), and "'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570), courts in this District required Section 11 plaintiffs to plead facts demonstrating that a registration statement contained a material misrepresentation. *See, e.g., In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005) ("In order to state a claim pursuant to Section 11, a plaintiff must allege facts demonstrating the defendant possessed the omitted information at the time the registration statement became effective…."). Courts thus carefully scrutinize Section 11 complaints to ensure that "[c]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal of Section 11 claims." *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 613 (S.D.N.Y. 2008) (internal quotation omitted), *aff'd*, 347 Fed. Appx. 665 (2d Cir. 2009). Plaintiffs cannot meet that standard here.

    A.    **<u>Plaintiffs' Theory No. 1</u>: RHI's Production Of 35, Not "Approximately 40," Movies Misled Investors**

The gravamen of plaintiffs' Complaint—on which hinges their theory that RHI failed to disclose a demand decline—is that RHI produced 35 films in 2008, not the "approximately 40" it had projected in June 2008. (¶¶ 27, 32.) This hindsight quibble supports no claim.

It is settled law that "[t]he truth of a statement made in the [registration statement] is adjudged by the facts as they existed when the registration statement became effective." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 254 (S.D.N.Y. 2004); *accord Zirkin v. Quanta Capital Holdings Ltd.*, No. 07 Civ. 851 (RPP), 2009 WL 185940, at *10 (S.D.N.Y. Jan. 23, 2009) ("The relevant inquiry under the Securities Act is not whether the estimate disclosed in the offering documents later turned out to be correct, but rather whether the [c]ompany knew or had reason to know, at the time the offering documents were filed, that the statement was untrue."); *In re JP Morgan*, 363 F. Supp. 2d at 635. Here, however, the

Complaint alleges *no facts* even suggesting that the company knew or had reason to know that its projection of "approximately 40" movies was untrue in June 2008. (Indeed, it was not untrue, because 35 movies were made—well within the range contemplated by "approximately 40.")

Section 11 claims are routinely dismissed on this basis. For example, in *In re Flag Telecom*, plaintiffs brought a Section 11 claim based on the allegation that a January 2000 registration statement overstated the demand for the issuer's telecommunications services. *See* 308 F. Supp. 2d at 252, 254. Judge Conner dismissed that claim because plaintiff failed to "plead[] any facts that indicate any of these statements were untrue as of the effective date." *Id.* at 255. Similarly, in *Scibelli v. Roth*, No. 98 Civ. 7228 (HB), 2000 WL 122193 (S.D.N.Y. Jan. 31, 2000), plaintiffs attempted to bring a Section 11 claim against Northern Telecom Ltd. ("Nortel") because its July 24, 1998 prospectus did not disclose a business downturn later announced on September 29, 1998. *Id.* at *1. Judge Baer dismissed the claims, explaining that "[t]o *infer* that Nortel *possessed* such information on July 24 because Nortel *announced* such information on September 29 is not a reasonable inference, and…plaintiffs' complaint fails on this score." *Id.* at *3 (emphasis in original). The same result is appropriate here.[1]

Moreover, even if the projection of "approximately 40" movies was inaccurate when made (which it was not), no reasonable investor could have been misled by it. "The

---

[1] Plaintiffs' allegation that "at the time of the filing of the Registration Statement, RHI did not have firm orders for the 40 MFT films and mini-series despite its representation concerning its ordering and production schedule" is unavailing. (¶ 29(a).) For one thing, RHI never stated that it *had* 40 firm orders as of June 2008, and so the allegation that it did not have 40 firm orders cannot constitute a false statement. Moreover, RHI expressly *disclosed* that it "may begin production for a MFT or mini-series without an initial licensee's firm order." (Ex. A, at 19.) This allegation thus salvages no claim. *See White v. Melton*, 757 F. Supp. 267, 272 (S.D.N.Y. 1991) (a court "must dismiss a complaint founded on allegations of securities . . . [law violations] if the allegedly omitted or misrepresented information was in fact appropriately disclosed").

8

central inquiry in determining whether a [registration statement] is materially misleading under…Section 11 is whether defendants' representations, taken together and in context, would have misled a reasonable investor…" *I. Meyer Pincus & Assoc. v. Oppenheimer*, 936 F.2d 759, 761 (2d Cir. 1991) (internal citations omitted).  Here, it defies common sense (and the English language) to assert that any reasonable human being could have thought in June 2008 that a projection of "approximately 40" movies by year-end did not encompass the possibility that 35 movies would be made.  This quibble certainly does not state a "plausible" claim under *Twombly*.  *See, e.g.*, *Rubke v. Capital Bancorp, Ltd.*, 551 F.3d 1156, 1163 (9th Cir. 2009) (dismissing Section 11 claim based on "squabbles about the adverbs used in the registration statement . . . [that] fail[] to indicate that the language used was false"); *In re Merrill Lynch Auction Rate Sec. Litig.*, No. 09 MD 2030 (LAP), 2010 WL 1257597, at *12 (S.D.N.Y. Mar. 31, 2010) (dismissing claim based on "semantic distinction" between the words "routinely" and "systematically").

      **B.**      <u>**Plaintiffs' Theory No. 2:  RHI Failed To Disclose That Changing Technology Could Affect Demand For Its Movies**</u>

Plaintiffs' next theory is that RHI failed to disclose the decline in demand it faced because of the "[t]he onslaught of new digital media platforms," such as digital video recorders and mobile devices, which they say decreased the audience for television movies and led to "less advertising dollars" for television networks, and thus "reduc[ed] licensing fees to production companies…such as RHI." (¶¶ 23, 29(c).)  This theory is meritless on several levels.

First, plaintiffs allege no facts establishing this lengthy causative chain.  Although they list technologies that could impact demand for MFT movies (¶ 23), they point to nothing that shows that these technologies actually had an impact on RHI, or to what extent.  Nor is there any allegation that RHI did not take these technologies into account when forecasting that it

9

would make "approximately 40" movies in 2008. Instead, plaintiffs simply assert, in an entirely conclusory and fact-free fashion, that these technologies caused "a significant decline in demand for MFT [movies] and miniseries." (*Id.*) This is not enough to support a Section 11 claim. *See, e.g.*, *Garber*, 347 Fed. Appx. 665 at 669-70 (affirming dismissal of Section 11 claim where alleged failure to disclose "a dramatic increase in integration-related expenses" was "too conclusory" to state a claim); *Landmen Partners Inc. v. Blackstone Group, L.P.*, 659 F. Supp. 2d 532, 544-45 (S.D.N.Y. 2009) (dismissing Section 11 claim for "fail[ure] to allege facts, as distinct from conclusory statements" linking a general decline in the U.S. real estate market as the cause of the alleged decline in defendants' real estate investments).

Second, as noted above, RHI's registration statement expressly informed investors of the potential risks associated with new technologies:

- "The advancement of video technologies may cause advertisers to shift their expenditures to media in which their commercial messages are not circumvented by technology, leading to a reduction in television advertising and a reduction in demand for our programming."

- "Advances in technologies or alternative methods of product delivery or storage or certain changes in consumer behavior driven by these or other technologies and methods of delivery and storage could have a negative effect on our business."

- "In particular, broadcast and cable networks place significant reliance on the revenue stream generated from commercial advertising."

- "Since the introduction of video technology such as Digital Video Recording, or DVR, television audiences now have the ability to circumvent commercials while they view television programming, which could negatively impact advertising demand for the advertisers for our content, and could therefore adversely affect our revenue. Similarly, further increases in the use of portable devices that allow users to view content of their own choosing while avoiding traditional commercial advertisements could adversely affect our revenue."

- "DVR technology may cause advertisers to decrease their spending for broadcast and cable television advertising."

(Ex. A, at 20.) These disclosures preclude any claim based on new technologies' alleged effect on demand for RHI's movies.

No reasonable investor could possibly conclude, in light of these disclosures, that there was no risk that new technologies could affect demand for television content. *See I. Meyer Pincus*, 936 F.2d at 762-73. Moreover, the "bespeaks caution" doctrine holds that "[a] defendant may not be liable…for misrepresentations in a prospectus if the alleged misrepresentations were sufficiently balanced by cautionary language within the same prospectus such that no reasonable investor would be misled about the nature and risk of the offered security." *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96 (2d Cir. 2004); *Zirkin*, 2009 WL 185940, at *13 ("alleged misrepresentations . . . are immaterial as a matter of law if it cannot be said that any reasonable investor could consider them important . . . in light of the [accompanying] cautionary language…."). Here, the alleged misrepresentation (the supposed omission of changing technologies and their potential impact on RHI's customers' advertising revenue and hence demand for RHI's movies) was directly addressed in the risk disclosures above and can support no claim. *See Klein v. Maverick Tube Corp.*, 790 F. Supp. 68, 69 (S.D.N.Y. 1991), *aff'd*, 969 F.2d 1041 (2d Cir. 1992) (dismissing Section 11 claims because prospectus "fairly and accurately disclosed the risks of investing in the oil industry"); *Rubin v. MF Global, Ltd.*, 634 F. Supp. 2d 459, 472-73 (S.D.N.Y. 2009) (where prospectus warned of potential for ineffective risk management methods, reasonable investor could not have been misled into thinking that the risk of a rogue trader exceeding trading limit did not exist); *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F. 3d 2, 5, 9 (2d Cir. 1996) (affirming dismissal of Section 11 claims where "plaintiffs' claims are contradicted by the disclosure of risk made on the face of each prospectus"); *Demaria v.*

*Anderson*, 318 F.3d 170, 180-82 (affirming dismissal of Section 11 claims where "cautionary statements and the specific, prominent disclosures" in the prospectus "bespeak caution").

Third, "[a]lthough the underlying philosophy of federal securities regulations is that of full disclosure, there is no duty to disclose information to one who reasonably should already be aware of it." *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 249-50 (S.D.N.Y. 2003) (citing *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978)).[2] Here, neither the existence of digital video recorders (which plaintiffs acknowledge have existed since at least 2000 (¶ 23)) and mobile devices nor their potential impact on television was secret. (*See, e.g.*, Frank Ahrens, *Gone in 30 Seconds: Traditional TV Spot May Be Headed Towards Extinction As More Advertisers Pitch Their Messages on the Web*, Wash. Post, June 16, 2007, at D1 (Ex. F) ("[I]t is clear that ad money is moving to the Internet from traditional advertising."); Brian Steinberg, *Advertising: TV Networks Gear Up for Telling 'Upfront' Talks*, The Wall St. J., Mar. 15, 2006, at B3 (Ex. G) (noting that advertisers are "shifting out of traditional media into new media and programming"); Tenille Bonoguore, *Are You Getting The Message?,* The Globe and Mail, Oct. 12, 2006, at E1 (Ex. H) ("[Consumers are] turn[ing] to video-on-demand, the Internet, mobile phone downloads and other new media mixes to create their own world of media entertainment that…take them out of the advertiser's reach….").)

---

[2]   *See also In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003) ("Where allegedly undisclosed material information is in fact readily accessible in the public domain, the Second Circuit has found that a defendant may not be held liable for failing to disclose this information."); *In re Arbinet-theexchange, Inc.*, No. 05-4404 (JLL), 2006 WL 3831396, at *6 (D.N.J. Dec. 28, 2006) ("[T]he securities laws do not require companies to state the obvious.").

Dismissal is warranted for this additional reason. *See Landmen*, 659 F. Supp. 2d at 545 (dismissing Section 11 claim because reasonable investors are expected to understand general market conditions); *In re Arbinet*, 2006 WL 3831396, at *6 (dismissing Section 11 claim where defendant company whose revenue depended on number of phone call voice-minutes cautioned that wireless phone calls were increasing and it was publicly known that wireless calls were shorter in duration than land-line calls and so a "reasonable investor would understand . . . that an increase in wireless calling could lead to a decrease in Arbinet's revenues"); *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 279 (3d Cir. 2004) (issuer was "not duty-bound to disclose general industry-wide trends easily discernable from information already available in the public domain"); *Whirlpool Fin. Corp. v. GN Holdings*, 67 F.3d 605, 609 (7th Cir. 1995) ("The nondisclosure of…industry-wide trends is not a basis for a securities fraud claim.").

      C.      **Plaintiffs' Theory No. 3:  RHI Failed to Disclose That It Obtained Only A Portion of Production Expense In Advance of Production**

Plaintiffs' final theory is that RHI failed to disclose that its ability to produce films was "dependent upon its ability to finance deficit production costs" which was impeded due to the supposedly reduced demand for its films.  (¶¶ 29(d), 30.)  This theory also fails.

To begin, this theory is entirely redundant of plaintiffs' first two theories because it assumes that the demand for RHI's movies was less than it disclosed in June 2008 when it predicted it would make "approximately 40" movies.  As explained above, plaintiffs have alleged no facts establishing a claim based on those theories, and, therefore, this theory also fails.

In any event, the registration statement (as quoted above) clearly stated that RHI typically obtains only a fraction of its production expenses in advance through "an initial license fee that typically equals 30% to 60% of [its] production costs." (Ex. A, at 1; *see also id.* at 3 (RHI "collect[s] a significant portion of [] contracted cash during production and the remaining

13

contracted cash before expiration of the initial licensing period.").) The registration statement also explained that RHI seeks to raise additional funds by licensing the production to other entities. (*Id*. at 3.) It even explained that RHI "may begin production for a MFT [movie] or mini-series without an initial licensee's firm order." (*Id*. at 19.) Any investor who read these disclosures would know that RHI is responsible for generating the additional funds required for production that are not covered by the initial advance license fee. *See Garber*, 537 F. Supp. 2d at 612 ("Any reasonable investor would know" that employees might change jobs following a reorganization); *In re Arbinet*, 2006 WL 3831396, at *6. This theory supports no claim.

## II.     THE COMPLAINT FAILS TO STATE A SECTION 15 CLAIM

A claim for controlling person liability "under Section 15 of the Securities Act . . . is necessarily predicated on a primary violation of securities law." *Rombach v. Chang*, 355 F.3d 164, 177-78 (2d Cir. 2004). Here, the only primary Securities Act violation alleged—a Section 11 claim—is subject to dismissal for the reasons discussed above. "As there are no surviving primary violations upon which plaintiffs could rest the[ir] claims, plaintiffs' Section 15 . . . claims [must be] dismissed." *Garber*, 537 F. Supp. 2d at 618.

## Conclusion

For the foregoing reasons, defendants respectfully request that the Court dismiss the Amended Complaint with prejudice.

Dated:   New York, New York
        May 3, 2010                       LATHAM & WATKINS LLP

                                        By:   /s/  Jeff G. Hammel
                                                James E. Brandt
                                                Jeff G. Hammel

                                        885 Third Avenue
                                        New York, New York 10022
                                        Telephone: (212) 906-1200
                                        Facsimile: (212) 751-4864

                                        Attorneys for Defendants