UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| ───────────────────────── x | | |
| HAROLD KLEIMAN, Individually and On Behalf of All Others Similarly Situated, | : | Civil Action No. 1:09-cv-08634-AKH |
| | : | |
| | : | <u>CLASS ACTION</u> |
| Plaintiff, | : | |
| | : | PLAINTIFF'S MEMORANDUM OF LAW |
| vs. | : | IN OPPOSITION TO DEFENDANTS' |
| | : | MOTION TO DISMISS THE AMENDED |
| RHI ENTERTAINMENT, INC., et al., | : | CLASS ACTION COMPLAINT |
| | : | |
| Defendants. | : | |
| | : | |
| ───────────────────────── x | | |

## TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT .....................................................................................1

II.   STATEMENT OF FACTS .............................................................................................2

    A.    RHI and its IPO ...................................................................................................2

    B.    The Registration Statement Misled Investors About the Material Risk That
        RHI Would Be Unable to Achieve Its 2008 Film Production Forecast.................3

    C.    The Registration Statement Also Failed to Disclose Decreased Demand
        for Television Advertising, Lower Licensing Fees and Risks to Production
        Financing ...........................................................................................................6

    D.    Post-IPO Events..................................................................................................6

III.  ARGUMENT .................................................................................................................8

    A.    The Standard Governing a Motion to Dismiss .....................................................8

    B.    The Standard Governing Section 11 ....................................................................9

    C.    Materially Misleading Statements and Omissions Concerning RHI's 2008
        Film Production Forecast ..................................................................................10

        1.    The Omission That RHI Did Not Have Firm Orders for 40 Films
            Was Materially Misleading in Context...................................................10

        2.    Item 503 of Regulation S-K Required Defendants to Disclose That
            RHI Did Not Have Firm Orders for 40 Films .........................................15

    D.    Materially Misleading Statements and Omissions Concerning Decreased
        Demand for Television Advertising, Reduced Licensing Fees and
        Production Financing Risks................................................................................15

IV.   CONCLUSION ............................................................................................................20

# TABLE OF AUTHORITIES

Page

**CASES**

*Ashcroft v. Iqbal,*
129 S. Ct. 1937 (2009) ......................................................................9

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ..........................................................................9

*Briarwood Invs. Inc. v. Care Inv. Trust Inc.,*
No. 07 Civ. 8159 (LLS), 2009 U.S. Dist. LEXIS 18963
(S.D.N.Y. Mar. 4, 2009) ............................................... 11, 13, 18, 20

*Burch v. Pioneer Credit Recovery, Inc.,*
551 F.3d 122 (2d Cir. 2008) .............................................................8

*Citiline Holdings, Inc. v. iStar Fin., Inc.,*
No. 08 Civ. 3612 (RJS), 2010 U.S. Dist. LEXIS 29706
(S.D.N.Y. Mar. 26, 2010) ......................................................*passim*

*Cortec Inds., Inc. v. Sum Holding L.P.,*
949 F.2d 42 (2d Cir. 1991) .............................................................21

*Ganino v. Citizens Utils. Co.,*
228 F.3d 154 (2d Cir. 2000) ...........................................................10

*Garber v. Legg Mason, Inc.,*
347 Fed. Appx. 665 (2d Cir. 2009) .................................................20

*Herman & MacLean v. Huddleston,*
459 U.S. 375 (1983) ....................................................................9, 10

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.,*
936 F.2d 759 (2d Cir. 1991) ...........................................................10

*In re Burlington Coat Factory Sec. Litig.,*
114 F.3d 1410 (3d Cir. 1997)..........................................................14

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
308 F. Supp. 2d 249 (S.D.N.Y. 2004) .............................................12

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
411 F. Supp. 2d 377 (S.D.N.Y. 2006) ...............................................9

**Page**

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   618 F. Supp. 2d 311 (S.D.N.Y. 2009) .................................................................. 9, 10, 13, 17

*In re Fuwei Films Sec. Litig.*,
   634 F. Supp. 2d 419 (S.D.N.Y. 2009) .......................................................................... 10, 19

*In re Initial Pub. Offering Sec. Litig.*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003) .......................................................................... 10, 16

*In re Initial Pub. Offering Sec. Litig.*,
   358 F. Supp. 2d 189 (S.D.N.Y. 2004) ................................................................................ 17

*In re Merrill Lynch Auction Rate Sec. Litig.*,
   No. 09 MD 2030 (LAP), 2010 WL 1257597
   (S.D.N.Y. Mar. 31, 2010) .................................................................................................. 14

*In re Moody's Corp. Sec. Litig.*,
   599 F. Supp. 2d 493 (S.D.N.Y. 2009) ............................................................................. 13

*In re Nortel Networks Corp. Sec. Litig.*,
   238 F. Supp. 2d 613 (S.D.N.Y. 2003) ................................................................................ 8

*In re Prestige Brands Holding, Inc.*,
   No. 05 CV. 06924 (CLB), 2006 U.S. Dist. LEXIS 46667
   (S.D.N.Y. July 10, 2006) ................................................................................................... 17

*In re Rockefeller Center Props., Inc. Sec. Litig.*,
   311 F.3d 198 (3d Cir. 2002) .............................................................................................. 20

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001) ................................................................................................ 20

*Landmen Partners Inc. v. Blackstone Group, L.P.*,
   659 F. Supp. 2d 532 (S.D.N.Y. 2009) ............................................................................. 20

*Lin v. Interactive Brokers Group, Inc.*,
   574 F. Supp. 2d 408 (S.D.N.Y. 2008) ............................................................................. 19

*P. Stolz Family P'ship L.P. v. Daum*,
   355 F.3d 92 (2d Cir. 2004) ................................................................................................ 18

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
   347 Fed. Appx. 617 (2d Cir. 2009) .................................................................................. 21

**Page**

*Patane v. Clark*,
  508 F.3d 106 (2d Cir. 2007) ..............................................................................9

*Phelps v. Kapnolas*,
  308 F.3d 180 (2d Cir. 2002) ..............................................................................8

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) .........................................................................9, 10

*Rubke v. Capital Bancorp, Ltd.*,
  551 F.3d 1156 (9th Cir. 2009) ..........................................................................14

*Scibelli v. Roth*,
  No. 98 Civ. 7228 (HB), 2000 WL 122193
  (S.D.N.Y. Jan. 31, 2000) ..................................................................................12

*United States v. Forbes*,
  249 Fed. Appx. 233 (2d Cir. 2007) ...................................................................14

STATUTES, RULES AND REGULATIONS

15 U.S.C.
  §77k ...........................................................................................................*passim*
  §77o .......................................................................................................... 2, 20

17 C.F.R.
  §229.303(a)(3)(ii) ...........................................................................................16
  §229.503(c) .....................................................................................................15

Federal Rules of Civil Procedure
  Rule 8..............................................................................................................20
  Rule 8(a) .........................................................................................................10
  Rule 12(b)(6)...................................................................................................8, 9

SECONDARY AUTHORITIES

*Mgmt.'s Discussion and Analysis of Fin. Condition and Results of Operations Certain
  Inv. Co. Disclosures*, SEC Release No. 6835, 1989 WL 1092885 (May 18, 1989) ...............16

Lead Plaintiff United Food & Commercial Workers Union Local 655 ("Plaintiff") respectfully submits this memorandum of law in opposition to Defendants' motion to dismiss the Amended Class Action Complaint (the "AC," cited herein as "¶__"), dated May 3, 2010 ("Def. Mem. at __"), filed by Defendants RHI Entertainment, Inc. ("RHI" or the "Company"), Robert A. Halmi, Jr. ("Halmi") and William J. Aliber ("Aliber") (collectively, "Defendants").

## I.    PRELIMINARY STATEMENT

This securities class action, asserting non-fraud claims under the Securities Act of 1933 (the "Securities Act"), alleges that Defendants engaged in negligent misrepresentations and omissions in connection with the initial public offering ("IPO") of RHI common stock.

RHI is a film production company, which began its short-lived stint as a publicly-traded company with a staggering amount of leverage and debt. In the Registration Statement (defined below) for its IPO, RHI represented that it mitigated the risk associated with producing films by not beginning production until it had a firm order for a licensing fee. ¶25. The Registration Statement also described RHI's seasonal production cycle: films were ordered early in the year, produced during the spring and summer, and delivered to customers during the second half of the year, when RHI generated most of its revenues. ¶24. Finally, the Registration Statement assured investors that, as of the June 2008 IPO – by which time films would have been ordered and under production – RHI "expect[ed]" to deliver "approximately 40" films during 2008. ¶28. Investors were counting on RHI's ability to reduce its leverage and begin generating profitability in the second half of 2008 by making good on that assurance. Importantly, each and every film delivered was critical to the Company's ability to do so.

In this context, the Registration Statement portrayed RHI's production model as practically risk-free as of the June 2008 IPO, and its expectation of delivering approximately 40 films during 2008 as a virtual certainty. At the same time, the Registration Statement omitted the material fact

that RHI did not have firm orders for those 40 films at the time of the IPO (June 2008), despite its representation that films were ordered *before* the spring.

These facts sufficiently state claims under Sections 11 and 15 of the Securities Act, which only require Plaintiff to allege a material misstatement or omission in the Registration Statement. Cognizant that Plaintiff's pleading burden on this motion is light, Defendants primarily argue that RHI's June 2008 statement that it expected to deliver 40 films could not have been misleading because that forecast was an "approximate" number, and encompassed the lowered projection of 30 to 35 films that RHI ultimately announced. The market reaction to RHI's revised forecast however, makes clear that investors *were* misled by the Registration Statement's characterization of RHI's production model and the failure to disclose that there were not firm orders for the 40 films that RHI projected. Analysts also clearly considered the shortfall to be material, concluding that the lower production guidance would "significantly impact cash flow" (Ex. H. at 1), and estimating that it could reduce fourth quarter revenues by $70 million. Ex. G at 1.[1]

Accordingly, and as set forth in greater detail below, it is respectfully submitted that Plaintiff has met its *prima facie* burden of alleging material misrepresentations and omissions and, as such, Defendants' motion to dismiss should be denied in its entirety.

## II.    STATEMENT OF FACTS

### A.    RHI and its IPO

Defendant RHI develops, produces, and distributes new made-for-television ("MFT") movies, mini-series, and other television programming worldwide, and also produces new episodic

---

[1]    "Ex. __" refers to the exhibits to the Declaration of David A. Rosenfeld, dated June 24, 2010, submitted herewith.

series programming for television.  ¶¶7, 18.  In addition, RHI owns a library of existing television content, which it licenses primarily to broadcast and cable networks worldwide.  ¶7.

RHI was formed in January 2006, when Defendant Halmi, private equity firm Kelso & Company and other investors purchased Hallmark Entertainment from Hallmark Cards in a leveraged buyout, and renamed it RHI Entertainment.  ¶18; *see also* Ex. A at 10.  Following the formation of the Company, RHI diversified the type of content it was developing, producing and distributing, expanded its film library, and also expanded the networks to which it licensed and distributed its content.  ¶19; *see also* Ex. A at 13.

On June 13, 2008, in advance of the IPO, RHI filed a Form S-1/A Registration Statement with the Securities and Exchange Commission ("SEC").  ¶20.  On June 19, 2008, RHI's Prospectus, which forms part of the Registration Statement (collectively, the "Registration Statement"), became effective and more than 13.5 million shares of RHI's common stock were sold to the public, raising more than $189 million for the Company.  ¶21.

> **B.    The Registration Statement Misled Investors About the Material Risk That RHI Would Be Unable to Achieve Its 2008 Film Production Forecast**

The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.  ¶22.  In particular, the Registration Statement highlighted the Company's low-risk, "[p]roven production model[,]" which included the following "[k]ey elements[:]"

- commencing production when we have a firm order for an initial license fee;

- collecting a significant portion of this contracted cash during production and the remaining contracted cash before the expiration of the initial licensing period; and

- contracting with additional customers to pre-sell rights which account for a majority of our production costs prior to delivery of our content.  ¶26.

The Registration Statement also highlighted RHI's ability to "mitigate production risk" by keeping production expenses low, and positively described the demand for the Company's products. ¶¶26-28.   In the Registration Statement, Defendants stated that, "*[i]t is our practice not to commence production until we have a firm order* for an initial license fee . . . ." (¶25), and that "*[d]uring 2008, we expect to develop, produce and distribute approximately 40 MFT movies and mini-series.*"   ¶28; *see also* ¶27.[2]

Importantly, RHI's film production cycle is highly seasonal in nature.  The Registration Statement described how programming is generally ordered by RHI's customers late in the preceding year or early in the current year, with planning and production taking place during the spring and summer, and completed film projects delivered by RHI in the third and fourth quarters. ¶24.  Therefore, the Company generates most of its revenues during the second half of the year.  *Id.* In 2007, RHI generated 75% of its revenues during the fourth quarter alone.  *See* Ex. B at 86.

While RHI used the proceeds of the IPO to pay down its heavy debt load, the Company remained highly leveraged following the IPO, with debt totaling more than $548 million, and cash on hand of only $5.3 million as of June 30, 2008.  *See* Ex. C at 3.[3]  Because RHI was so highly leveraged, every film that RHI planned to deliver was critical to maintaining the Company's liquidity, and to generating the revenues needed to reduce the Company's heavy debt burden and improve profitability.  For example, Defendant Halmi told investors following the IPO that, "the goal is to – when we get into the fourth quarter and we generate most of our revenue and most of our cash flow, use that to pay the revolver back down."  *See* Ex. D at 9.  RHI's new productions were

---

[2]      All emphasis is added, unless otherwise noted.

[3]      This debt included: (i) two first lien facilities, a $175 million term loan and a $350 million revolving credit facility; and (ii) a $55 million senior second lien term loan.  *See* Ex. C at 3.

also important because they would continue to generate revenues for RHI's film library, and offset the declining profitability of older film titles. *See* Ex. A at 6; *see also* ¶28.

Analysts noted that maintaining liquidity and reducing debt were key concerns for RHI. For example, a July 28, 2008 Cowan and Company report stated that:

- "[W]e have concerns about the Company's relatively high debt load . . . ." Ex. A at 1.

- "[W]e remain somewhat cautious on the prospects for [RHI] shares due to the highly leveraged nature of the company." *Id*. at 2.

- "RHI has faced liquidity issues in the past." *Id*. at 10.

- "We believe that the company's ability to meet its debt and operating obligations is highly reliant upon the company's expectation for improved future operating performance." *Id*. at 11.

Likewise, an August 7, 2008 Thomas Weisel Partners report noted that, "[w]e anticipate seeing some debt progress in the second half of the year which is critical to our rating and target price." Ex. E at 2.

Since RHI received its 2008 film production orders from customers in late 2007 or early 2008, and these films would largely have been in production by the time of the June 2008 IPO, the Registration Statement created the misleading impression that RHI's forecast of expecting to deliver 40 films during 2008 was based on orders that it had received prior to the spring. In reality, despite the Company's representations concerning its ordering and production schedule, RHI did not have firm orders for 40 MFT movies and mini-series at the time of the IPO. ¶29. The Registration Statement, however, failed to disclose the significant risk that RHI would not be able to achieve its production forecast of delivering 40 MFT movies and mini-series during 2008, and, as a result, would be unable to reduce its heavy debt burden and increase profitability as planned.

### C.   The Registration Statement Also Failed to Disclose Decreased Demand for Television Advertising, Lower Licensing Fees and Risks to Production Financing

In addition, the Registration Statement misrepresented and failed to disclose that, by the time of the IPO, there was a significant decline in demand for MFT movies and mini-series. ¶23. The onslaught of new digital media platforms – which allowed advertisers to diversify into targeted Internet marketing – and the advent of digital video recorder ("DVR") technology – which allowed audiences to fast-forward through commercials – had resulted in increasingly fewer advertising dollars being spent on television advertising. *Id.* The significant decline in advertising revenue for television, in turn, had resulted in the reduction of licensing fees to production companies specializing in film products for television broadcasts, such as RHI. *Id.*

As a consequence of the significantly decreased demand and lower licensing fees for RHI's MFT movies and mini-series, there was a substantial risk that RHI would be unable to obtain sufficient licensing fees to cover a majority of RHI's production costs in advance of delivering content. ¶29. Since RHI's ability to produce ordered MFT movies and mini-series was dependent on its ability to finance production costs, there was also a substantial risk that RHI would be unable to complete production of ordered MFT movies and mini-series. *Id.* The Registration Statement, however, failed to meaningfully disclose that this widespread, long-term trend away from MFT movies and mini-series, as well as declining advertising revenues, were resulting in significantly decreased demand and lower domestic and foreign licensing fees for RHI's films at the time of the IPO. ¶¶23, 29. By omitting this material information, the Registration Statement presented a positive – but inaccurate – picture of the Company and its business.

### D.   Post-IPO Events

On August 7, 2008, RHI issued a press release announcing its second quarter financial results, and stating that it anticipated delivering "35 to 40 MFT movies and miniseries,"

predominately during the third and fourth quarters of 2008. ¶31. Then, on November 6, 2008, with the announcement of its third quarter financial results, RHI disclosed that due to "current economic conditions," the Company was further revising its anticipated film production schedule for 2008 downward, to between 30 and 35 films – 11% to 25% less than the original schedule announced in the Registration Statement. ¶32. In addition, Defendant Halmi stated that RHI was "closely monitoring . . . reduced television advertising spending in the fourth quarter of 2008 and the first half of 2009 and the potential impact that this could have on the demand for, and pricing of, our film content and the distribution of our programming." *Id*.

Analysts responded by issuing reports downgrading RHI's stock, with a November 6, 2008 Thomas Weisel Partners report commenting that, "one of the main tenets of our Overweight rating was the view that leverage would decline materially. With the disclosure that the company's debt levels are now at $568 million[,] up $20 million from 2Q08 combined with a slowing outlook, we do not see any material debt reduction until later in 2009." Ex. F at 1. A J.P. Morgan analyst report issued the following day emphasized that the reduced production schedule would have a significant impact on the Company's revenues and earnings: "We are now modeling for 32 films in CY08 as well as CY09 (vs. 40 previously), ***driving a reduction in our revenue estimate (down $70m* to $140m *in 4Q08*** and down $73m to $315m in CY09). This drives $0.32 and $0.35 EPS declines in 4Q08 and CY09, respectively, to $1.08 and $0.70." Ex. G at 1. And, a November 7, 2008 Renaissance Capital report noted that, "RHI's shares traded down 31% following its 3Q earnings report ***because of concerns that the lower production guidance will significantly impact cash flow***." Ex. H at 1. Following these announcements, the price of RHI common stock declined sharply over the next two trading days, from $13.91 per share on Thursday, November 6, 2008 to $7.95 per share on Monday, November 10, 2008, on heavy trading volume. ¶33.

On March 5, 2009, RHI announced its financial results for the fourth quarter and full year 2008, and reported a net loss of $58.4 million for the full year of 2008, as compared to a loss of $22.6 million in 2007. ¶34. In response to this announcement, RHI's common stock dropped from $2.26 per share to $1.40 per share. ¶35. Since that time, RHI continued to report disappointing results, and its stock price continued to decline. *See* ¶36. RHI's common stock was ultimately delisted on June 9, 2010.[4]

## III.   ARGUMENT

### A.    The Standard Governing a Motion to Dismiss

In ruling on a motion to dismiss, a court must construe the complaint liberally, accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor. *See Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008).[5] At issue on a Fed. R. Civ. P. 12(b)(6) motion "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." *Phelps v. Kapnolas*, 308 F.3d 180, 184-85 (2d Cir. 2002). In essence, "[a] pleading is not a trial and plaintiffs are not required to marshal their evidence and sustain a verdict at this stage." *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 621 (S.D.N.Y. 2003).

---

[4]    The Registration Statement and the August 7, 2008 press release are referenced in the AC, and Plaintiff was also aware of, and relied on, the publicly available analyst reports and conference calls referenced herein in bringing suit. *See, e.g., Citiline Holdings, Inc. v. iStar Fin., Inc.*, No. 08 Civ. 3612 (RJS), 2010 U.S. Dist. LEXIS 29706, at *3 (S.D.N.Y. Mar. 26, 2010) (considering, on a motion to dismiss, "statements or documents incorporated into the CAC by reference, legally required public disclosure documents filed with the . . . [SEC], and documents upon which Plaintiff relied in bringing suit"). As such, the Court should consider the materials annexed as exhibits to the Rosenfeld Declaration in this response to Defendants' motion. In any event, if the Court finds it necessary, these materials can be included in an amended complaint.

[5]    Citations and internal quotation marks are omitted, unless otherwise noted.

A complaint "attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," but rather must simply provide the grounds of entitlement to relief and raise a right to relief above the speculative level. *Bell Atl. Corp. v. Twombly* ("*Twombly*"), 550 U.S. 544, 555 (2007). Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570). "The plausibility standard is not akin to a probability requirement," and is satisfied "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. Under this standard, "[o]nly a statement of facts so conclusory that it fails to give notice of the basic events and circumstances on which a plaintiff relies should be rejected as legally insufficient under [Rule] 12(b)(6)." *Patane v. Clark*, 508 F.3d 106, 116 (2d Cir. 2007).

## B.    The Standard Governing Section 11

Section 11 imposes a "stringent standard of liability on the parties who play a direct role in a registered offering." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 321 (S.D.N.Y. 2009) ("*Flag Telecom II*") (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983)). The issuer and any person who signed the registration statement or served as a director is strictly liable if the registration statement: (1) contained an untrue statement of material fact; (2) omitted to state a required material fact; or (3) omitted to state a material fact necessary to make the statements therein not misleading. *See* 15 U.S.C. §77k(a); *see also Rombach v. Chang*, 355 F.3d 164, 168 n.2 (2d Cir. 2004).

To establish a *prima facie* claim under Section 11, "[a] plaintiff need only plead a material misstatement or omission in the registration statement." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 411 F. Supp. 2d 377, 382 (S.D.N.Y. 2006). Indeed, "[l]iability against the issuer of a security is virtually absolute, ***even for innocent misstatements***," while "[o]ther defendants bear the burden of

demonstrating due diligence." *Herman & MacLean*, 459 U.S. at 382. Section 11 does not require pleading or proof that a defendant acted with intent to defraud or even knew that misrepresentations or omissions had been made. *Rombach*, 355 F.3d at 169 n.4 (Section 11 does not require "that plaintiffs allege the scienter or reliance elements of a fraud cause of action"). Such claims are subject only to the notice pleading standards of Fed. R. Civ. P. 8(a), and a short and plain statement of the claim will suffice. *See In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 342 (S.D.N.Y. 2003). The AC satisfies this standard.

### C.    Materially Misleading Statements and Omissions Concerning RHI's 2008 Film Production Forecast

#### 1.    The Omission That RHI Did Not Have Firm Orders for 40 Films Was Materially Misleading in Context

"At the pleading stage, a plaintiff satisfies the materiality requirement . . . by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 439 (S.D.N.Y. 2009) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161-62 (2d Cir. 2000)). "[C]ourts do not grant motions to dismiss . . . on grounds of immateriality, unless the misstatements [or omissions] are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Citiline Holdings*, 2010 U.S. Dist. LEXIS 29706, at *17.

"The Second Circuit has stated that 'a violation of Section 11 will be found when material facts have been omitted or presented in such a way as to obscure or distort their significance.'" *Flag Telecom II*, 618 F. Supp. 2d at 320 (quoting *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991)). "The inquiry does not focus on whether particular statements, taken separately, were literally true, but whether [D]efendants' representations, taken together and in context, would have misl[ed] a reasonable investor about the nature of the [securities]." *Fuwei Films*, 634 F. Supp. 2d at 440 (alterations in original); *see also Flag Telecom II*, 618 F. Supp. 2d at

324 ("It is well-settled that the principle of *caveat emptor* does not apply to a public offering of stock and, therefore, investors need not cobble together information from various parts of the Registration Statement to uncover material information.").

Here, the Registration Statement failed to disclose that, at the time of the filing of the Registration Statement, RHI did not have firm orders for 40 MFT films and mini-series. *See* ¶¶29-30. Instead, the Registration Statement emphasized RHI's low-risk, "proven" production model, and described its seasonal production cycle, whereby the Company received programming orders from customers late in the previous year or early in the current year, production took place during the spring and summer, and completed films were delivered in the second and third quarters. ¶¶24-26. The Registration Statement further stated that, "*[i]t is our practice not to commence production until we have a firm order* for an initial license fee . . .," which RHI would have received by early 2008, well in advance of the June IPO. ¶25. By telling investors, as of the June 2008 IPO – by which time most of RHI's ordered films would have already been under production – that RHI "*expect[ed]*" to deliver approximately 40 MFT movies and mini-series during 2008, Defendants presented a misleading picture of a virtually risk-free production model, *i.e.*, that 40 films were already on track for delivery by the end of 2008. ¶¶24, 28. Given the timing of RHI's unequivocal assurances about its production forecast, a reasonable investor would have been misled by RHI's failure to disclose that it did not, in fact, have firm orders for 40 MFT movies and mini-series at the time of the IPO. *See Briarwood Invs. Inc. v. Care Inv. Trust Inc.*, No. 07 Civ. 8159 (LLS), 2009 U.S. Dist. LEXIS 18963, at *8-*9 (S.D.N.Y. Mar. 4, 2009) (statement that "we *expect* [key financing from two lenders] to be in place shortly . . . after consummation of this offering" was misleading where company failed to disclose that is was experiencing difficulty securing financing on acceptable terms, and that one of the potential lenders was an alleged shell company unlikely to

extend financing); *see also Citiline Holdings*, 2010 U.S. Dist. LEXIS 29706, at *4-*7, *15-*16 (holding that defendants violated Section 11 by making categorically favorable statements about iStar's high-quality, low-risk loan portfolio shortly before the secondary offering, while failing to disclose in the registration statement that iStar's portfolio was already experiencing increasing loan losses and declining credit quality).

Defendants do not seriously dispute that they had a duty to accurately disclose RHI's film production prospects as they existed at the time of the IPO. Instead, they contend that RHI's statement that, as of the June IPO, the Company "expect[ed]" to deliver "approximately 40" films during 2008 (¶28), could not have misled a reasonable investor because it "encompass[ed] the possibility that 35 movies would be made." Def. Mem. at 9; *see also id.* at 1-2, 7-8. This argument fails for at least two reasons. *First*, RHI's own description of the timing of its production cycle makes clear that Defendants did, in fact, "kn[o]w or have reason to know" in June 2008 that RHI's projection of expecting to deliver 40 films was anything but certain. Def. Mem. at 8.[6] Yet RHI's unequivocal assurance that it "expect[ed]" to deliver 40 films reasonably led investors to believe that such an outcome was a given because those films had presumably already been ordered. ¶28; *see In*

---

[6]    The fact that, due to the seasonal nature of RHI's business, Defendants **did** have reason to know at the time of the IPO that RHI might not be able to meet its production forecast, because it did not have firm orders for 40 films at the time of the Registration Statement, distinguishes this case from those cited by Defendants. *See* Def. Mem. at 8 (citing *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 255-56 (S.D.N.Y. 2004) (general statements about the state of the telecommunications industry were accurate at the time of the IPO, since demand did not weaken until much later) and *Scibelli v. Roth*, No. 98 Civ. 7228 (HB), 2000 WL 122193, at *3 (S.D.N.Y. Jan. 31, 2000) (plaintiffs provided no support for their claim that Nortel must have known of a decline in demand at the time of the July IPO merely because it announced the decline in September)).

*re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 509 (S.D.N.Y. 2009) (statements which "imply certainty" are misleading and actionable).[7]

The generic disclaimer that RHI "may begin production . . . without an initial licensee's firm order" (Def. Mem. at 8 (citing Hammel Decl. Ex. A at 19); *see also id.* at 14),[8] buried in the middle of a paragraph, under a heading warning that RHI "***may*** not be able to ***sustain*** . . . [its] production model . . ." is insufficient to counterbalance RHI's prominent, affirmative description of its production model, whereby it was RHI's "practice not to commence production until" a firm order was in place, which a reasonable investor would have interpreted as meaning that RHI did, in fact, have firm orders for 40 films at the time of the IPO. ¶25; *see Briarwood*, 2009 U.S. Dist. LEXIS 18963, at *9-*10 (where Care affirmatively stated that it expected to obtain financing shortly after the offering, generic disclaimer that there was "no assurance" it would be able to do so was insufficient); *see also Flag Telecom II*, 618 F. Supp. 2d at 325 ("scattered disclosures . . . were [in]sufficient . . . to disclose the material facts to reasonable investors").[9]

*Second*, the reaction of analysts and investors – who were counting on each planned film to help RHI reduce its leverage, maintain liquidity, and generate revenues – to the revised production forecast announced on November 6, 2008 demonstrates that the market considered a shortfall of as

---

[7]      Defendants' argument that since "RHI never stated that it had 40 firm orders as of June 2008, . . . the allegation that it did not have 40 firm orders cannot constitute a false statement" (Def. Mem. at 8 n.1) ignores the context of RHI's ***omission***, and the certainty implied by the Company's June 2008 statement that it expected to deliver 40 films.

[8]      References to "Hammel Decl. Ex. __" are to the exhibits to the Declaration of Jeff G. Hammel, dated May 3, 2010, submitted in support of Defendants' motion to dismiss.

[9]      This disclaimer is also of no assistance to Defendants because it only stated that ***going forward***, RHI might not adhere to its practice of waiting to begin production until it had a firm order, which would only impact the number of films delivered during 2009, since 2008 films would have already been ordered and in production by the time of the IPO.

few as five films to be significant. *See* Ex. F at 1 (downgrading RHI stock because increased debt levels "***combined with a slowing outlook***" meant that leverage would not decline materially until later in 2009); Ex. H at 1 (noting that RHI's stock had declined more than 30% "***because of concerns that the lower production guidance will significantly impact cash flow***"). In fact, an analyst report issued by J.P. Morgan estimated that if RHI delivered 32 films, as opposed to 40, it would reduce RHI's revenues by ***$70 million***, and its earnings per share by $0.32 per share, during the fourth quarter of 2008, when RHI earned the majority of its annual revenues. *See* Ex. G at 1. The sharp decline in RHI stock confirms that the market thought that the 11% to 25% downward revision in RHI's anticipated film production schedule for 2008 was material. ¶33; *see United States v. Forbes*, 249 Fed. Appx. 233, 236 (2d Cir. 2007) (holding that the "District Court correctly ruled that references to the decline in Cendant's stock price or investor losses were probative on the issue of materiality"); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997) ("In the context of an efficient market, the concept of materiality translates into information that alters the price of the firm's stock. . . ."). This market reaction makes clear that analysts and investors did not consider the lowered production outlook of 30 to 35 films to be "well within the range contemplated by approximately 40" (Def. Mem. at 8), and that a shortfall of even five films was in fact much more than a "squabble" or "semantic distinction" to analysts and investors. Def. Mem. at 9 (citing *Rubke v. Capital Bancorp, Ltd.*, 551 F.3d 1156, 1163 (9th Cir. 2009) and *In re Merrill Lynch Auction Rate Sec. Litig.*, No. 09 MD 2030 (LAP), 2010 WL 1257597, at *12 (S.D.N.Y. Mar. 31, 2010)).

In sum, RHI's failure to disclose in the Registration Statement that it did not have firm orders for 40 MFT movies and mini-series was materially misleading in the context of: (i) RHI's statement that its practice was not to begin production until it had a firm order for an initial license fee (¶25);

(ii) RHI's description of its seasonal production cycle, whereby orders would have been received, and films would largely have been in production, by the time of the June 2008 IPO (¶24); and (iii) RHI's adamant assurance that it expected to deliver 40 films during 2008 (¶28).

> ### 2. Item 503 of Regulation S-K Required Defendants to Disclose That RHI Did Not Have Firm Orders for 40 Films

RHI's failure to disclose that it did not have firm orders for 40 MFT movies and mini-series at the time of the IPO is also actionable for the independent reason that it was a "significant factor[]" that . . . [made] the offering speculative or risky[,]" and was required to be discussed in the Registration Statement under Item 503(c) of Regulation S-K. ¶30 (citing 17 C.F.R. §229.503(c)). As set forth in the statement of facts above, each and every film produced was critical to RHI's ability to maintain liquidity and pay down its heavy debt load, and to generate the revenues needed to improve the Company's cash flow and profitability. Each film that RHI failed to deliver hindered its ability to reduce leverage, and also led to additional interest payments on loans and credit facilities that RHI was unable to pay down as planned. *See* Ex. B at 41. Further, each new production would continue to generate revenues for RHI's film library, and offset the declining profitability of older film titles. *See* Ex. A at 6; *see also* ¶28. Accordingly, the fact that RHI did not have firm orders for the 40 MFT movies and mini-series that the Registration Statement forecasted for delivery during the second half of 2008 was a "significant factor[]" that made the offering "risky or speculative[,]" and was required to be disclosed, but was not. *See* 17 C.F.R. §229.503(c).

> ### D. Materially Misleading Statements and Omissions Concerning Decreased Demand for Television Advertising, Reduced Licensing Fees and Production Financing Risks

The Registration Statement also failed to adequately disclose that, by the time of the IPO, there was a significant decline in demand for MFT movies and mini-series, due to increasingly fewer advertising dollars being spent on television advertising. ¶23. The proliferation of new digital

media platforms had allowed advertisers to diversify into targeted Internet marketing, and the advent of DVR technology had enabled audiences to fast-forward through commercials, making television a less lucrative advertising forum. *Id.* By the time of the IPO, this significant decline in television advertising revenue had resulted in reduced licensing fees to production companies specializing in film products for television broadcasts, such as RHI. *Id.* The decreased demand and lower licensing fees for RHI's MFT movies and mini-series meant that there was a substantial risk that RHI would be unable to obtain sufficient licensing fees to cover a majority of RHI's production costs. ¶29. Since RHI's ability to produce ordered films was dependent on its ability to finance production costs, there was also a substantial risk that RHI would be unable to complete production of ordered MFT films and mini-series. *Id.*[10]

Pursuant to Item 303(a) of Regulation S-K, the Registration Statement was required to "describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." ¶30 (quoting 17 C.F.R. §229.303(a)(3)(ii)); *see also Mgmt.'s Discussion and Analysis of Fin. Condition and Results of Operations* ("MD&A"); *Certain Inv. Co. Disclosures*, SEC Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989) (SEC interpretive release, stating

---

[10]    While recognizing that these allegations involve an interrelated "causative chain" (Def. Mem. at 9), Defendants blatantly mischaracterize the AC's allegations as several distinct "theories," and then argue that each theory, on its own, fails to allege a violation of Section 11. *See generally* Def. Mem. at 7-14. But Defendants cannot recast the CAC's allegations into a theory they believe they can defeat; rather, they must address the claims as alleged. *See Initial Pub. Offering*, 241 F. Supp. 2d at 332.

Likewise, Plaintiff's allegations are not that the Registration Statement failed to accurately describe RHI's financing methods (*see* Def. Mem. at 13-14), but rather, that it failed to disclose the risk to RHI's ability to finance its film production costs through licensing fees, and the attendant risk that RHI would not be able to complete production of ordered films. ¶¶29-30.

that "[a] disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation").  The Registration Statement violated Section 11 by failing to disclose that this widespread, long-term trend away from MFT films and mini-series, caused by decreasing television advertising revenues, had led to lower demand and reduced licensing fees for RHI's MFT films and mini-series by the time of the IPO – thereby jeopardizing RHI's ability to finance production costs and complete production of ordered films.  ¶¶23, 29; *see In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 211 (S.D.N.Y. 2004) ("An omission of fact required to be stated under Item 303 will generally produce liability under Section 11"); *see also Citiline Holdings*, 2010 U.S. Dist. LEXIS 29706, at *15-*20 (holding that defendants failed to adequately disclose trend of declining loan portfolio performance in the registration statement, as required by Item 303(a)).

In fact, the Registration Statement presented a picture of ***increasing*** demand for RHI's MFT movies and mini-series.  *See* Ex. B at 2 (describing, in the "Prospectus Summary," under the heading "Market & competitive overview," the growing demand for television programming and stating that "content companies such as ours are expected to benefit"); *see also id.* at 78; ¶28.  These misstatements and omissions concerning the demand for RHI's content were materially misleading. *Flag Telecom II*, 618 F. Supp. 2d at 322 ("a reasonable investor . . . would have found presales, and the extent to which they were an accurate reflection of market demand, to be material to his or her investment"); *see also In re Prestige Brands Holding, Inc.*, No. 05 CV. 06924 (CLB), 2006 U.S. Dist. LEXIS 46667, at *23 (S.D.N.Y. July 10, 2006) (holding that the failure of a registration statement to disclose declining demand for key products sufficiently stated a claim for a violation of Section 11).

- 17 -

Remarkably, Defendants *admit* that changing technologies were causing waning demand for television advertising for more than *two years* before the IPO, by citing three news articles dated March 15, 2006, October 12, 2006 and June 16, 2007, discussing decreased spending on television advertising. *See* Def. Mem. at 12 (citing Hammel Decl. Exs. F-H). While these news articles establish that widespread declines in television advertising spending were occurring long before the IPO, and that Defendants knew, or should have known of that trend, they do *not* relieve Defendants of their obligation to disclose these facts in the Registration Statement.[11] Instead, the Registration Statement contained only generic and boilerplate warnings that changing technologies such as the growing popularity of DVRs and the Internet "*may* cause advertisers to shift their expenditures" and "decrease their spending for broadcast and cable television advertising[,]" "which *could* negatively impact advertising demand for the advertisers of our content, and *could* therefore adversely affect our revenue" and "*could* have a negative effect on our business." *See* Def. Mem. at 10-11 (quoting Hammel Decl. Ex. A at 20). These vague warnings of potential risks do not entitle Defendants to the protection of the bespeaks caution doctrine. *See* Def. Mem. at 10-12; *Briarwood*, 2009 U.S. Dist. LEXIS 18963, at *9-*10 (stating that "[i]f a party is aware of an actual danger or cause for concern, the party may not rely on a generic disclaimer in order to avoid liability" and holding that defendants were not entitled to the protection of the bespeaks caution doctrine). Because the Registration Statement failed to reveal the specific risks that had already transpired, the cautionary language in question cannot be considered "adequate" under Second Circuit case law. *See, e.g.*, *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004) ("The cautionary language associated with the

---

[11]    Whether or not Defendants considered the impact of new technologies when they forecasted that RHI would deliver 40 MFT movies and mini-series in 2008 is irrelevant to the fact that they did not disclose that impact to investors. *See* Def. Mem. at 9-10.

bespeaks caution doctrine is aimed at warning investors that bad things may come to pass – in dealing with the contingent or unforeseen future.  Historical or present fact – knowledge within the grasp of the offeror – is a different matter."); *Lin v. Interactive Brokers Group, Inc.*, 574 F. Supp. 2d 408, 417 (S.D.N.Y. 2008) ("no amount of general cautionary language can protect a company from failure to disclose a specific, known risk or a risk that has already occurred").

Further, Defendants cannot rely on these news articles to claim that declining spending on television advertising – or the impact on RHI – was publicly known, and therefore was not required to be disclosed in the Registration Statement.  *See* Def. Mem. at 12.  "[S]poradic press reports or reports published in other contexts may not be considered to be part of the information that was reasonably available to investors."  *Fuwei Films*, 634 F. Supp. 2d at 438.  Defendants had a duty to prepare an accurate and complete Registration Statement, and the fact that some information (which was not incorporated by reference in, and had no bearing on, the Registration Statement) may have been in the public domain does not absolve Defendants of their responsibility.  *See id.* at 437-38 (holding that "the publication of three newspaper articles . . . [did] not transform the information contained within the articles into matters of general public knowledge that may properly be imputed to . . . stockholders" and did "not excuse Defendants . . . from their . . . dut[y] to disclose" that information in the registration statement); *see also Citiline Holdings*, 2010 U.S. Dist. LEXIS 29706, at *16-*17 (rejecting defendants' argument that "the market readily appreciated . . . trends" of declining loan portfolio performance).[12]

Defendants contend that these allegations are conclusory because the AC does not contain detailed facts about when, and to what extent, changing technologies led to decreased television

---

[12]    Indeed, the Registration Statement itself advised investors: "You should **rely only** on the information contained in this prospectus."  Ex. B at ii.

advertising revenues, and in turn adversely impacted the demand for RHI's MFT movies and mini-series and the Company's ability to finance film production costs through licensing fees. *See* Def. Mem. at 9-10; *see also id.* at 13-14. The AC, though, explains *how* these events unfolded, and need not contain the factual details that Defendants would require. Nor could it, since RHI never revealed those details. Without the benefit of discovery, Plaintiff can only be expected to know of the end result that RHI disclosed – namely, that despite RHI's positive representations about its low risk production model and the high demand for its films, less than five months after IPO, the Company announced a significant reduction in the number of MFT movies and mini-series that it planned to deliver in 2008. The AC's allegations are plausible and comport with the pleading requirements of Rule 8. *Accord In re Rockefeller Center Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002) (recognizing that plaintiffs need not plead "factual information [that] is peculiarly within the defendant's knowledge or control"); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (a plaintiff is not required to plead "detailed evidentiary matter").[13]

## IV.    CONCLUSION[14]

For all of the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motion to dismiss in its entirety.[15]

---

[13]    The AC's allegations go well beyond those held insufficient in *Garber v. Legg Mason, Inc.*, 347 Fed. Appx. 665, 669-70 (2d Cir. 2009), where the complaint alleged that a company failed to disclose increased integration expenses "far in excess" of internal budgets, but did not contain any facts relating to the magnitude of the discrepancy, and *Landmen Partners Inc. v. Blackstone Group, L.P.*, 659 F. Supp. 2d 532, 544 (S.D.N.Y. 2009), where allegations that a company's real estate investments were at risk because the market was beginning to deteriorate were insufficient because plaintiffs provided only facts about problems in the residential mortgage market, whereas the company's investments were primarily in commercial real estate. *See* Def. Mem. at 10.

[14]    Because the AC sufficiently alleges that RHI committed a primary violation of Section 11, and that each of the Individual Defendants is a control person of RHI, the Section 15 claim survives dismissal as well. *See Briarwood*, 2009 U.S. Dist. LEXIS 18963, at *14-*15.

DATED:  June 24, 2010

ROBBINS GELLER RUDMAN
 & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
ERIN W. BOARDMAN


_____
          */s/ David A. Rosenfeld*
       DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

*Lead Counsel for Plaintiff*

---

[15]      In the event that the Court finds the AC insufficient for any reason, Plaintiff respectfully requests an opportunity to amend.  *See Cortec Inds., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead."); *see also Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 347 Fed. Appx. 617, 622 (2d Cir. 2009) (in determining whether leave to amend should be granted, "courts may consider all possible amendments").

<u>CERTIFICATE OF SERVICE</u>

I, David A. Rosenfeld, hereby certify that on June 24, 2010, I caused a true and correct copy

of the attached:

> Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss
> the Amended Class Action Complaint; and

> Declaration of David A. Rosenfeld in Support of Plaintiff's Opposition to
> Defendants' Motion to Dismiss the Amended Class Action Complaint

to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send

notification of such public filing to all counsel registered to receive such notice.



*/s/ David A. Rosenfeld*
DAVID A. ROSENFELD